**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

In re                                                            Chapter 7

WATERFORD WEDGWOOD USA, INC., *et al.*                           Case No. 09-12512 (SHL)

Debtors.                        (Jointly Administered)

----------------------------------------------------------------x

JOHN S. PEREIRA, as Chapter 7 Trustee for
WATERFORD WEDGWOOD USA, INC.,

Plaintiff,

vs.
                                                                 Adv. No. 11-01820 (SHL)

UNITED PARCEL SERVICE OF AMERICA, INC.
a/k/a UPS, UPS FREIGHT, UPS SUPPLY CHAIN
SOLUTIONS (GEORGIA), UPS-CONSOLIDATED
and UPS-PHILLY,

Defendant(s).

----------------------------------------------------------------x

JOHN S. PEREIRA, as Chapter 7 Trustee for
ROYAL DOULTON USA, INC.,

Plaintiff,

vs.
                                                                 Adv. No. 11-02177 (SHL)

UNITED PARCEL SERVICE OF AMERICA, INC.
a/k/a UPS, UPS FREIGHT, UPS SUPPLY CHAIN
SOLUTIONS (GEORGIA), UPS-CONSOLIDATED
and UPS-PHILLY,

Defendant(s).

----------------------------------------------------------------x

## POST-TRIAL MEMORANDUM OF DECISION

A P P E A R A N C E S:

TROUTMAN SANDERS, LLP
*Attorneys for John S. Pereira, as Chapter 7 Trustee for*
*Waterford Wedgewood USA, Inc. and Royal Doulton USA, Inc.*
By:     John P. Campo, Esq.
        John S. Kinzey, Esq.
405 Lexington Avenue
New York, NY 10174

KING & SPALDING, LLP
*Attorneys for United Parcel Service of America, Inc.*
  By:  Harris Winsberg, Esq.
       Jonathan W. Jordan, Esq.
1180 Peachtree Street
Atlanta, Georgia 30309

-and-

  By:  Scott Davidson, Esq.
       Gary Ritacco, Esq.
1185 Avenue of the Americas
New York, New York 10036

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are two adversary proceedings brought by the Chapter 7 Trustee (the

"Plaintiff" or the "Trustee") of Waterford Wedgwood USA, Inc. ("Waterford") and Royal

Doulton USA, Inc. ("Doulton" and, together with Waterford, the "Debtors") against United

Parcel Service of America Inc., UPS Freight, UPS Professional Services, UPS Supply Chain

Solutions (Georgia), UPS-Consolidated, and UPS-Philly (collectively, "UPS" or the

"Defendants").  Pursuant to Section 547 of the Bankruptcy Code, the Trustee seeks to recover

alleged preferential transfers made to UPS in the amount of $897,546.85 by Waterford and

$81,828.22 by Daulton within 90 days of the filing of this bankruptcy case.  The Trustee also

requests prejudgment interest.  UPS does not dispute that the transfers were preferences but

asserts that they were made in the ordinary course of business and under ordinary business terms

2

as contemplated by Sections 547(c)(2)(A) and 547(c)(2)(B) of the Bankruptcy Code,

respectively.  Based on the evidence presented at trial,[1] the Court finds that some—but not all—

of the transfers were made according to ordinary business terms under Section 547(c)(2)(B).

The Court reserves its decision on whether any transfers were made in the ordinary course of

business until the parties ascertain whether such a determination is necessary.[2]

## BACKGROUND

The parties have stipulated to the relevant facts regarding the Debtors, the bankruptcy

case, and the parties' business relationship.  Waterford and Doulton were wholly owned indirect

subsidiaries of Waterford Wedgwood PLC ("PLC"), an Irish company.  *See* Joint Pretrial Orders,

Section III, ¶ 1.  The Debtors were in the business of importing, distributing and selling china,

crystal and other consumer goods that were manufactured by PLC and its affiliates.  *See id.* at

Section III, ¶ 2.  In connection with this business, the Debtors purchased and obtained shipping

and related services from UPS.  *See id.* at Section III, ¶ 3.  Upon providing services to the

Debtors, the Defendants would issue an invoice.  *See id.* at Section III, ¶ 4.  The Debtors would

pay UPS by check.  *See id.*

On January 5, 2009, PLC was placed in receivership in Ireland and certain of its

subsidiaries and affiliates were placed in administration in the United Kingdom.  *See* Daulton

Joint Pretrial Order at Section III, ¶ 10; Waterford Joint Pretrial Order at Section III, ¶ 7.  On

---

[1]    The parties have consented to this Court entering a final order or judgment in these adversary proceedings.
*See* Joint Pretrial Orders at Section II (Adv. No. 11-01820, ECF No. 19; Adv. No. 11-02177, ECF No. 13).

[2]    The Defendants assert the defense of new value under Section 547(c)(4) of the Bankruptcy Code.  At trial,
the Plaintiff conceded that some of the transfers in question represented new value.  *See* Trial Tr. 41:13-14 (March
19, 2013).  The parties, however, have not quantified the amount of new value upon which they agree.  *See id.* at
57:3-11 (Defendants requesting that Court first make determination with respect to defenses under Section 547(c)(2)
before Defendants determine and calculate the new value defense); *see id.* at 169:8-10.  It is unclear based upon the
Court's ruling today and the undisputed new value defense transfers whether there is a need to address the ordinary
course of business defense.

February 27, 2009, the receiver and the joint administrators in the foreign proceedings entered into a Share and Business Sale Agreement (the "Global Sale Agreement") with KPS Capital Partners LLP ("KPS"). *See* Daulton Joint Pretrial Order at Section III, ¶ 11; Waterford Joint Pretrial Order at Section III, ¶ 8. The Global Sale Agreement provided for, among other things, the sale of substantially all of the Debtors' assets to KPS or its designee. *See* Daulton Joint Pretrial Order at Section III, ¶ 12; Waterford Joint Pretrial Order at Section III, ¶ 9. On March 26, 2009, the Debtors sold substantially all of their assets to WWRD LLC (an affiliate of KPS) and ceased doing business. *See* Daulton Joint Pretrial Order at Section III, ¶ 13; Waterford Joint Pretrial Order at Section III, ¶ 10. On April 23, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief with this Court pursuant to Chapter 7 of the Bankruptcy Code. *See* Daulton Joint Pretrial Order at Section III, ¶ 14; Waterford Joint Pretrial Order at Section III, ¶ 11.

The Trustee filed the Waterford adversary proceeding on April 20, 2011 and the Daulton adversary proceeding on May 24, 2011. Both seek the return of money paid by the Debtors during the statutory preference period. Transfers from the Debtors to the Defendants on or after January 23, 2009 through the Petition Date are covered by the 90 day time period set forth in Section 547(b)(4)(A) of the Bankruptcy Code (the "Preference Period"). Trial in these cases took place on March 19, 2013. *See* Transcript of Trial (Waterford Adversary ECF No. 30; Daulton Adversary ECF No. 24). The parties completed their post-trial briefing on May 16, 2013.

## DISCUSSION

### A. Preferential Transfers and Defenses

To be avoidable as a preferential transfer, a payment must satisfy each of the requirements of Section 547(b) of the Bankruptcy Code. The Trustee bears the burden of proving the transfers were:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such Transfers were made;

(3) made while the debtor was insolvent;

(4) on or within ninety (90) days before the date of filing of the petition; and

(5) enable the benefited creditor to receive more than such creditor would have received had the case been a chapter 7 liquidation and the creditor not received the transfer.

11 U.S.C. § 547(b). UPS does not challenge the Trustee with respect to these elements, and the Court finds that the Trustee has made the necessary *prima facie* case under Section 547(b) that the payments were preferential transfers.[3]

UPS instead contends that the payments fall under the two exceptions contained in Section 547(c)(2) of the Bankruptcy Code. Section 547(c)(2), as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), provides that:

(c) The trustee may not avoid under this section a transfer –

(2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was –

(A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or

---

[3] In fact, the parties stipulated in their pre-trial pleadings that the criteria listed in Section 547(b) were met. *See* Joint Pretrial Orders at Section III.

(B) made according to ordinary business terms.

11 U.S.C. § 547(c)(2).

Section 547(c)(2) is meant to protect "recurring, customary credit transactions that are incurred and paid in the ordinary course of business of the debtor and the debtor's transferee." *Official Comm. Of Unsecured Creditors of Enron Corp. v. Martin (In re Enron Creditors Recovery Corp.)*, 376 B.R. 442, 459 (Bankr. S.D.N.Y. 2007) (quoting *Sender v. Heggland Family Trust (In re Hedged-Investments Assocs.)*, 48 F.3d 470, 475 (10th Cir. 1995)).  The purpose of the exception is to "leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or [its] creditors during the debtor's slide into bankruptcy." *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 41 (2d Cir. 1996) (quoting H.R. Rep. No. 95-595 (1978) at 373, reprinted in 1978 U.S.C.C.A.N. 6329).

Prior to 2005, Section 547(c)(2) required a creditor to prove that the transfer was made both in the ordinary course of the debtor's business under Section 547(c)(2)(A) and according to ordinary business terms under Section 547(c)(2)(B).  The BAPCPA amendments made the test disjunctive, allowing a defendant to prevail by proving either the so called "subjective" test under Section 547(c)(2)(A), or the so called "objective" test under Section 547(c)(2)(B).  *See Jacobs v. Gramercy Jewelry Mfg. Corp. (In re M. Fabrikant & Sons, Inc.)*, 2010 WL 4622449, at *2 (Bankr. S.D.N.Y. Nov. 4, 2010).  As the wording of the subsections was not changed by BAPCPA in 2005, the case law prior to BAPCPA's enactment as to the requirements of each subsection remains good law.  *See id.* at *2 (citations omitted).

A creditor bears the burden of proving the defenses by a preponderance of the evidence. *Id.* at 39 (citations omitted); 11 U.S.C. § 547(g).  UPS has invoked both subsections of Section

547(c)(2) by submitting evidence to support its argument that the transfers were "made in the ordinary course of business or financial affairs of the debtor and the transferee" and were "made according to ordinary business terms." *See* 11 U.S.C. § 547(c)(2).  While the Court reserves decision today on whether any transfers were made in the ordinary course of business under Subsection (A), it is necessary to discuss both defenses in order to understand and evaluate the arguments made by the parties on the ordinary business terms defense under Subsection (B).

Subsection (A) is a "subjective element that requires an examination of whether a transfer was ordinary between the parties to the transfer." *Daly v. Radulesco (In re Carrozzella & Richardson)*, 247 B.R. 595, 603 (B.A.P. 2d Cir. 2000) (citations omitted); *see also In re Enron Creditors Recovery Corp.*, 376 B.R. at 459 (stating that the subjective test focuses solely on the prior dealings of debtor and creditor).  In determining whether a transfer satisfies the requirements of Section 547(c)(2)(A), courts examine several factors including "(i) the prior course of dealing between the parties, (ii) the amount of the payment, (iii) the timing of the payment, (iv) the circumstances of the payment, (v) the presence of unusual debt collection practices, and (vi) changes in the means of payment." *Buchwald Capital Advisors LLC v. Metl-Span I., Ltd. (In re Pameco Corp.)*, 356 B.R. 327, 340 (Bankr. S.D.N.Y. 2006); *see also Official Comm. of Unsecured Creditors of 360networks (USA) Inc. v. U.S. Relocation Servs. (In re 360networks (USA) Inc.)*, 338 B.R. 194, 210 (Bankr. S.D.N.Y. 2005); *Hassett v. Goetzmann (In re CIS Corp.)*, 195 B.R. 251, 258 (Bankr. S.D.N.Y. 1996).

The creditor must establish a "baseline of dealings" between the parties in order to "enable the court to compare the payment practices during the preference period with the prior course of dealing." *In re M. Fabrikant & Sons, Inc.*, 2010 WL 4622449, at *3 (citations omitted); *see also Cassirer v. Herskowitz (In re Schick)*, 234 B.R. 337, 348 (Bankr. S.D.N.Y.

7

1999).  The creditor must "demonstrate some consistency with other business transactions between the debtor and the creditor." *In re M. Fabrikant & Sons, Inc.*, 2010 WL 4622449, at \*3 (citations omitted).  "The starting point—and often ending point—involves consideration of the average time of payment after the issuance of the invoice during the pre-preference and post-preference periods, the so-called 'average lateness' computation theory." *Id.*  While a late payment is usually nonordinary, the defendant can rebut this presumption if late payments were the standard course of dealing between the parties. *See id.* (quoting 5 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 504.04[2][ii], at 547–55 (16th ed. 2010)).  "To determine whether a late payment may still be considered ordinary between the parties, a court will normally compare the degree of lateness of each of the alleged preferences with the pattern of payments before the preference period to see if the alleged preferences fall within that pattern."  5 COLLIER ON BANKRUPTCY ¶ 504.04[2][ii], at 547-55.  Generally, this involves a comparison of the average number of days between the invoice and payment dates during the pre-preference and preference periods. *See In re M. Fabrikant & Sons, Inc.*, 2010 WL 4622449, at \*3; *see also Hassett v. Altai, Inc. (In re CIS Corp.)*, 214 B.R. 108, 120 (Bankr. S.D.N.Y. 1997).

Subsection (B) is an objective test which "looks not to the specifics of the transaction between the debtor and the particular creditor, but rather focuses on general practices in the industry, in particular the industry of the creditor." *Abovenet, Inc. v. Lucent Technologies, Inc. (In re Metromedia Fiber Network, Inc.)*, 2005 WL 3789133, \*5 (Bankr. S.D.N.Y. Dec. 20, 2005).  It is well established that the creditor's industry is the measure for ordinariness under this subsection. *See, e.g., Matter of Midway Airlines*, 69 F.3d 792, 797 (7th Cir. 2004); *Sigmon v. Butner (In re Johnson Bros. Trucker, Inc.)*, 2001 WL 520649 \*4 (4th Cir. May 15, 2001); *Sass v.*

8

*Vector Consulting, Inc. (In re Am. Home Mortgage Holdings, Inc.)*, 476 B.R. 124, 140-41

(Bankr. D. Del. 2012); *Hechinger Liquidation Trust v. James Austin Co. (In re Hechinger Inv.

Co. of Delaware, Inc.),* 320 B.R. 541, 550 (Bankr. D. Del. 2004).

 In *In re Roblin Indus., Inc.*, the Second Circuit held that "'ordinary business terms' refers

to the general practices of similar industry members and that 'only dealings so idiosyncratic as to

fall outside that broad range should be deemed extraordinary and therefore outside the scope of

subsection C.'" *Roblin*, 78 F.3d at 39-40 (quoting *In re Tolona Pizza Products Corp.,* 3 F.3d

1029, 1033 (7th Cir. 1993).  "Under this standard, a creditor must show that the business terms

of the transaction in question were 'within the outer limits of normal industry practices. . . .'"

*Id.*; *see also In re Carled,* 91 F.3d 811, 818 (6th Cir. 1996) (holding that late payments are made

according to ordinary business terms so long as they are not "aberrational, unusual or

idiosyncratic" for creditors in the defendant's industry).  The "statutory language should not be

construed to place businessmen in a straitjacket."  *In re Gulf City Seafoods*, 296 F.3d 363, 368

(5th Cir. 2002).  "Some latitude exists under the objective prong, as the courts should not impose

a single norm for credit transactions within the industry; the inquiry is whether 'a particular

arrangement is so out of line with what others do' that it cannot be said to have been made in the

ordinary course."  *G.G. Leidenheimer Baking Co., Ltd. v. Sharp (Matter of SGSM Acquisition

Co.)*, 439 F.3d 233, 239 (5th Cir. 2006) (citing *In re Gulf City Seafoods*, 296 F.3d at 369).

 B.  **Ordinary Business Terms (Objective Test)**

 *1.  Evidence Presented by the Defendant*

 To demonstrate that the payments from the Debtors to UPS were similar to those in the

industry, UPS provided evidence of payments and invoice records between itself and the

Debtors.  *See* Joint Exhibits A, B, C, D, and E and Defendants' Exhibit C.  The amount and

9

timing of those payments are not in dispute.  The only other evidence presented at trial was the testimony of Thomas Salutric, an employee of UPS.  Mr. Salutric is a corporate credit manager at UPS and has worked in billing, credit management, credit approval, and credit risk analysis for more than 25 years.  *See* Defendants' Exhibit B.  Mr. Salutric is also an active member of the Credit Research Foundation and the National Association of Credit Managers.  *See id.*

Mr. Salutric testified, among other things, about the contract between the Debtors and UPS, its terms, and how and when the payments in question were made.  *See* Trial Tr. 82:15-83:7.  Mr. Salutric's testimony focused on the time customers took to pay UPS compared to other similarly situated shipping companies.  He testified that the Defendants followed normal industry practice during the period Defendants provided shipping services to the Debtors.  Mr. Salutric noted that UPS is the largest player in the domestic shipping market with approximately half of the domestic market share, and that it is not uncommon in the industry to allow some flexibility in paying invoices.  *See id.* at 70:23-25; 71:1-6; 74:6-75:6; 89:16-90:13.   While UPS's stated invoice terms are 32 days, Mr. Salutric testified that because of the economic downturn in late 2008, many of UPS's larger customers began to request some latitude in the time to pay invoices.  *See id.* at 74:16-25; 75:1-6; 85:7; 86:6-10.  Customers of other transportation companies did the same.  *See id.* at 75:1-6.  On average, during the time the Debtors conducted business with the Defendants, the Debtors paid their invoices later than their stated terms: approximately 51 days[4] during the Preference Period and 56 days during the historical period.  *See* Defendants' Exhibits A and C.

---

[4]     There actually is a slight discrepancy as to this number, with Defendants' Exhibit A listing 51 days and Defendants' Exhibit C stating 52 days.  Given that Defendants have the burden of proof on the defense, the Court will use the more conservative of these numbers.

Mr. Salutric's analysis of industry practices relied heavily upon data collected from the Credit Risk Monitor database ("CRMZ"), which monitors the average number of days for a company to receive revenue after a sale has been made.  *See* Defendants' Exhibit A; Trial Tr. 79:16-25.  Mr. Salutric used the information in the CRMZ database to compile a list of forty businesses in the domestic shipping industry, including UPS, FedEx Corporation, and Ryder System, Inc., and to calculate the average number of days that these companies received payment after a sale in 2008 and 2009.  *See* Defendants' Exhibit A.  He then ranked those businesses according to the average days sales outstanding ("DSO")[5] for the year.  *See id.*  Mr. Salutric testified that he relied upon 90% of the data, removing the top and bottom five percent in his analysis as outliers and concluded that the normal industry pay range in 2008 was from 14 to 70 days and from 16 to 72 days in 2009.  Defendants' Exhibit A; Trial Tr. 99:6-16.

According to the Defendants' CRMZ database chart, UPS received payments from all of its customers in 2009 on average 44 days after sale while industry competitors, FedEx and Ryder, received payments on average in 40 and 45 days respectively.  *See* Defendants' Exhibit A.  In 2008, UPS received payments on average within 45 days and FedEx and Ryder received payments on average in 41 and 46 days respectively.  *See id.*  Mr. Salutric concluded that UPS's average days to payment during 2008 and 2009 aligned with industry practice.  Mr. Salutric further concluded that during the period UPS and the Debtors conducted business, UPS's pay range was between 16 and 88 days, which he found to be a reasonable deviation from industry norm considering market conditions and the size of the Debtors.  *See* Trial Tr. 102:15-104:16.

---

[5]    Mr. Salutric testified that DSO is credit terminology for the calculation of how long it takes a sale to be paid.  It is used by a company to measure its effectiveness in the credit world.  *See* Trial Tr. 92:16-22.

2. *The Trustee's Arguments*

The Trustee did not present any witnesses at trial, choosing only to engage in limited cross examination of Mr. Salutric. Trustee's counsel asked limited questions about the use of the CRMZ database and did not identify any alternative source of information about the payment practices in the domestic shipping industry. The Trustee instead focused on the proper scope of the ordinary business terms defense and criticism of Mr. Salutric's methodology. The Trustee's arguments fall generally into four categories, which the Court will address separately.

The Trustee first argues that the relationship between the Debtors and UPS was not conducted in accordance with ordinary business terms because there were fluctuations in the parties' payment history over time. To illustrate this point, the Trustee divided the history of payments between UPS and the Debtors into three periods: 1) November 24, 2007 to September 30, 2008, which was more than six months before the bankruptcy filing; 2) October 2, 2008 to February 28, 2009, which was over one month into the 90 day Preference Period; and 3) March 1, 2009 to April 7, 2009, which includes some 38 days of the 90 day Preference Period. *See* Plaintiff's Exhibits 1, 2, and 3. The purported purpose of this analysis was to contrast the payment times during the first and third periods with the payment times during the second period.[6] The Trustee contends this disparity is evidence that the Debtors accelerated their payments to UPS as the closing of the Global Sale Agreement approached, and the transfers therefore must fall outside normal industry practice. As payments during the second period were paid significantly later than the first and third periods, the Trustee contends that they were

---

[6]     According to the Trustee, UPS received payments from the Debtors on its invoices on average within 49 days during the first period and 44 days during the third period whereas during the second period, UPS received payments on average within 72 days. *See* Plaintiff's Exhibits 1, 2, and 3. There are questions, however, about the basis for the selection of these three time periods, which the Defendants criticize as a result oriented test. The Trustee has provided no case law to support this methodology, which largely disregards whether payments were made during the Preference Period.

markedly different from the terms upon which UPS routinely collected its invoices and therefore not made according to ordinary business terms.

The Trustee's argument fails, however, because it improperly conflates the subjective and objective components of Section 547(c)(2).  It is essentially asking the Court to rule that the objective defense cannot be met if the parties' relationship changes over time.[7]  But under Section 547(c)(2)(B), a creditor need only "show that the business terms of the transaction in question were 'within the outer limits of normal industry practices.'"  *Roblin Indus.*, 78 F.3d at 40 (quoting *Tolona Pizza Products,* 3 F.3d at 1033)).  "The conduct of the debtor and creditor are considered objectively in light of industry practice."  *Roblin Indus.*, 78 F.3d at 40.  And "only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of" the defense.  *Id.* (quoting *Tolona Pizza Products,* 3 F.3d at 1033). As the focus of the objective test is the standard in the industry, the historical experience between the Debtor and UPS should be of little to no import under Subsection (B).

Indeed, "courts do not look at the manner in which one particular creditor interacted with other similarly situated debtors, but rather analyze whether the particular transaction in question comports with the standard conduct of business within the industry."  *Logan v. Basic Distribution Corp. (In re Fred Hawes Org., Inc.),* 957 F.2d 239, 245-46 (6th Cir. 1992); *see also Abovenet Inc. v. Lucent Technologies, Inc. (In re Metromedia Fiber Network, Inc.)*, 2005 Bankr. LEXIS 3168, at *17 (Bankr. S.D.N.Y. Dec. 20, 2005) ("'[M]ade according to ordinary business terms,' looks not to the specifics of the transaction between the debtor and the particular creditor, but rather focuses on general practices in the industry, in particular the industry of the creditor.")

---

[7]     The Plaintiff provided no case law to support this interpretation of the statute, instead citing to two cases in which the courts remarked that the parties practices were consistent prior to and during the preference period.  *See Tolona Pizza*, 3 F.3d at 1033; *McCord v. Venus Foods, Inc. (In re Lan Yik Foods Corp.)*, 185 B.R. 103, 115 (Bankr. E.D.N.Y. 1995).  But these were simply observations of the facts in those cases; neither case affirmatively stated that an objective analysis must take such factors into account.

"[T]he question must be resolved by consideration of the practices in the industry – not by the parties' dealings with each other." *In re Gulf City Seafoods*, 296 F.3d at 369.

The Trustee appears to be advocating for a return to the pre-BAPCPA test, when a successful defense under Section 547(c)(2) required a creditor to prove not only that the transfer was made in the ordinary course of business between the debtor and transferee, but also that it was made according to ordinary business terms (i.e., both the subjective and objective elements). But the statutory language of the BAPCPA amendments is clear.  Congress made the test disjunctive, allowing a defendant to prevail by proving either the subjective test under Section 547(c)(2)(A), or the objective test under Section 547(c)(2)(B).  *See In re M. Fabrikant & Sons, Inc.*, 2010 WL 4622449, at *2; *see, e.g., Appalachian Oil Co. v. Va. State Lottery Dept. (In re Appalachian Oil Co.)*, 2012 Bankr. LEXIS 4677 (Bankr. E.D. Tenn. Oct. 4, 2012) (finding transfers were not within the "ordinary course of business," but were made according to "ordinary business terms."))  If Congress intended to add a subjective component to Section 547(c)(2)(B) or to somehow make it more difficult for a creditor to prevail under the subsection, it could easily have done so.  Instead, Congress simply changed one word – "and" to "or" – and left the wording of the subparts unchanged.[8]

Indeed, the Trustee's view is contrary to the Second Circuit's clear guidance in *Roblin Industries, Inc. v. Ford Motor Company (In re Roblin Industries, Inc.)*, 78 F.3d 30 (2d Cir.

---

[8]     While not cited by the Trustee, the Court notes that *Hutson v. Branch Banking & Trust Co. (In re National Gas Distributors, L.L.C.)*, 346 B.R. 394 (Bankr. E.D.N.C. 2006), held that pre-BAPCPA case law discussing the ordinary business terms standard had been affected by the amendment to the statute and was therefore no longer instructive.  *See id.* at 402-03.  Cases in this jurisdiction, however, have stated that "the words of the subparagraphs have not changed, and the pre-2005 cases interpreting their requirements remain good law."  *In re M. Fabrikant & Sons, Inc.*, 2010 Bankr. LEXIS 3941, at *6 (citing 5 Collier on Bankruptcy ¶ 547.04[2], at 547-51).  Additionally, the approach adopted in *National Gas* has been rejected by other jurisdictions.  *See Simon v. Gerdau MacSteel, Inc. (In re American Camshaft Specialties, Inc.)*, 444 B.R. 347 (Bankr. E.D. Mich. 2011) (noting that while revisiting the ordinary business terms standard "might be warranted in other circuits where controlling precedent is unclear, the Sixth Circuit Court of Appeals has articulated a clear and consistent standard, from which this Court sees no reason to deviate.").

1996), which addressed the relationship between the objective and subjective elements of Section 547(b)(2).  In *Roblin*, the Second Circuit adopted the objective test used by *Tolona Pizza*, stating that a payment made according to ordinary business terms must be "ordinary from the perspective of the industry."  *Id.* at 40.  In reaching its conclusion, the Second Circuit observed that an alternative to the objective approach was to "look to the conduct of the parties themselves to determine if the terms of a preferential transfer are ordinary."  *Id.* at 41.  But it remarked that "by treating both [Section 547(c)(2)(A) and (B)] as subjective requirements and focusing entirely upon the conduct of the parties in question, the ordinary business terms requirement becomes surplusage.  Congress could not have intended that one of the three separate requirements enacted to satisfy [Section] 547(c)(2) was simply redundant."  *Id.*[9]

For its second argument, the Trustee urges the Court to focus on the Defendants' stated terms for payment.  Rather than compare the actual payment history with the typical payment practices in the industry, the Trustee appears to propose that the Court examine whether there has been a deviation from a creditor's stated payment policy.  *See* Plaintiff's Post-Trial Brief at 6.  But such an analysis would ensure that any late payment would be a transfer outside of ordinary business terms.  As such, the defense would be of little use to a creditor.  *See In re Carled,* 91 F.3d 811, 818 (6th Cir. 1996) (holding that late payments are made according to ordinary business terms so long as they are not "aberrational, unusual or idiosyncratic" for creditors in the defendant's industry).

Such a reading is inconsistent with the Second Circuit's interpretation of the ordinary business terms test.  In *Roblin*, the Second Circuit ruled that a payment made pursuant to a debt

---

[9]    Commentators have debated the policy wisdom of Congress's change to the statute, wondering whether the objective test is too low a hurdle.  *See In re National Gas Distributors L.L.C.*, 346 B.R. at 404-05.  But as there is no denying the plain language of the statute as amended, this Court leaves such policy choices to Congress.

15

restructuring agreement could be considered an ordinary business term if evidence is provided

that it is within the industry practice.  The Second Circuit stated that

> [t]o apply properly the . . . standard, "ordinary business terms" must include those
> terms employed by similarly situated debtors and creditors facing the same or
> similar problems.  *If the terms in question are ordinary for industry participants
> under financial distress, then that is ordinary for the industry.*  In this way, a
> creditor that agrees to restructure a debt in a manner consistent with industry
> practice in those circumstances does not lose the benefit of the exception.

*Roblin Indus.*, 78 F.3d at 42 (emphasis added); *see also Ganis Credit Corp. v. Anderson (In re

Jan Weilert Rv, Inc.)*, 315 F.3d 1192, 1198 (9th Cir. 2003) ("[C]reditors are not required to prove

a particular uniform set of business terms, rather, "ordinary business terms" refers to the broad

range of terms that encompasses the practices employed by those debtors and creditors, *including

terms that are ordinary for those under financial distress*.") (emphasis added).

The Trustee's view would also require a creditor to steadfastly adhere to the same

business practices throughout the entirety of its relationship with a debtor.  That would unduly tie

the hands of the creditor to deal with the exigencies of business in a real world setting and

discourage creditors from continuing to do business with a company in distress.[10]  It would not

allow a creditor to work with a debtor within the bounds of normal practices in the industry,

which is contrary to the Second Circuit's understanding of how the defense should operate:

> A creditor taking such steps should not be viewed as taking
> "unusual action" when it does no more than follow usual industry
> practice—precisely the kind of behavior the ordinary course of
> business exception was intended to protect.  Restricting a creditor
> to courses of action typical in untroubled times leaves no room for
> realistic debt workouts and unfairly penalizes those creditors that
> take conventional steps to institute a repayment plan.

---

[10]    Indeed, Mr. Salutric testified that during the financial crisis, shipping companies were allowing their
customers more flexibility in payment timing.  *See* Trial Tr. 70:23-25; 71:1-6; 74:6-75:6; 85:7; 86:6-10; 89:16-
90:13.  Thus, both the deviation from nominal terms and the variation in payment times from year to year were
within normal industry practice, as the entire shipping industry was simply responding to the financial crisis.

*Roblin*, 78 F.3d at 42.  The Second Circuit's flexible approach bolsters the two-fold purpose of

preference law: "the concern for the equitable treatment of all creditors as well as the desire to

discourage creditors from hastily forcing troubled businesses into bankruptcy." *Id.* at 40.  The

Trustee's position, therefore, is inconsistent with the general purposes of preference law:

> The ordinary course of business exception is consistent with the
> general thrust of preference law.  The exception benefits all
> creditors by protecting payments received by those creditors who
> remain committed to a debtor during times of financial distress
> while at the same time affording a measure of flexibility to
> creditors in dealing with the debtor, provided that the steps taken
> are consistent with customary practice among industry participants.

*Roblin*, 78 F.3d at 41.

In any case, the Court is hard pressed to see how a historical variation in the parties' prior

course of dealings constitutes a "term" as described by the Trustee.  *See Metromedia Fiber*

*Network*, 2005 Bankr. LEXIS 3168, at *24, *30 (Bankr. S.D.N.Y. Dec. 20, 2005) ("A threshold

point of inquiry is whether any of the *enumerated terms* of the Lucent Debt Rescheduling was, in

fact, "unique" or 'different' from other [debtors'] restructurings or the terms ordinarily agreed

upon in restructurings by telecommunications vendors.") (emphasis added).  The relationship

between the parties is precisely what is examined in the subjective test of Section 547(c)(2)(A).

To impose that requirement in the ordinary business terms analysis of Section 547(c)(2)(B)

would render 547(c)(2)(A) surplusage, and would also raise the requirements of the standard in a

way that Congress did not do in the plain language of BAPCPA.[11]

---

[11]    To the extent that the Trustee suggests that a creditor is required to mathematically compare the parties'
deviation from nominal payment terms against the deviation from nominal terms of those in the industry, the Court
also rejects that notion.  It would be impossible for the creditor to meet its evidentiary burden due to a lack of
available data.  Courts have acknowledged that "information about competitors' trade practices used to establish
industry standards may be difficult to obtain . . . .  Thus, courts must allow some flexibility regarding sources of
evidence used to establish the range of practices that will be deemed the industry standard." *Troisio v. E.B. Eddy*
*Forest Prods. (In re Global Tissue L.L.C.)*, 2004 U.S. App. LEXIS 14003, at *103 (3d Cir. July 7, 2004).  The
Trustee himself agrees that "the potential difficulty in obtaining industry data from competitors justifies a flexible
evaluating standard in proving what terms are "ordinary" in the industry . . . and that such proof may be based on the

Turning to the third category, the Trustee takes issue with the Defendants' method for comparing payments here to UPS with payments made by customers to other domestic shipping companies. As a threshold matter, the Trustee complains that looking "on an invoice-by-invoice basis, at each collection UPS made during the preference period, and declar[ing] each payment ordinary (or not ordinary), based on whether it fell within the outer bounds of the times other participants in the transportation industry took, on average, to collect their invoices pursuant to their individual business terms [is] . . . unprecedented, and inconsistent with the case law . . ." Plaintiff's Post-Trial Brief at 6. But the Court notes that other courts have done a similar analysis. *See, e.g., Schoenmann v. BCCI Constr. Co. (In re Northpoint Communs. Group, Inc.)*, 361 B.R. 149, 160 (Bankr. N.D. Cal. 2007). Indeed, such an approach is consistent with the plain language of the statute that "the trustee may not avoid under this section a *transfer* . . . to the extent that such *transfer* was . . . made according to ordinary business terms." 11 U.S.C. § 547(c)(2)(B) (emphasis added); *see also Roblin Indus.*, 78 F.3d at 40 (quoting *Tolona Pizza*, 3 F.3d at 1033) ("Under this standard, a creditor must show that the business terms *of the transaction* in question were 'within the outer limits of normal industry practices' . . . Assuming subsections (A) and (B) are satisfied, only *when a payment is ordinary* from the perspective of the industry will the ordinary course of business defense be available for an otherwise voidable preference.") (emphasis added); *Metromedia Fiber Network*, 2005 Bankr. LEXIS 3168, at *24, *30 (Bankr. S.D.N.Y. Dec. 20, 2005) ("As enacted by Congress, the statute requires the Court to focus on the *transfer* which is being challenged . . . . [Section 547(c)(2)(B)] asks whether the *transfer* was made in accordance with normal industry practice.").

---

testimony of an employee who has sufficient first-hand knowledge of industry practices." Plaintiff's Post-Trial Brief at 2.

The parties fail to cite any case law on the proper method for evaluating the actual transactions between the Debtors and UPS to see if they comport with industry practices. Nor did the Court find a consensus in the case law on the appropriate methodology. The Court, however, believes that it is useful to look to how courts analyze the subjective "ordinary course of business" defense. Under an ordinary course analysis, "'[t]o determine whether a late payment may still be considered ordinary between the parties, a court will normally compare the degree of lateness of each of the alleged preferences with the pattern of payments before the preference period to see if the alleged preferences fall within that pattern.' . . . Generally, this involves a comparison of the average number of days between the invoice and payment dates during the pre-preference and preference periods." *Davis v. R.A. Brooks Trucking, Co. (In re Quebecor World (USA), Inc.)*, 491 B.R. 379, 386 (Bankr. S.D.N.Y. 2013) (quoting 5 COLLIER ¶ 504.04[2][ii], at 547-55; citing *In re M. Fabrikant & Sons, Inc.*, 2010 WL 4622449, at *4; *Hassett v. Altai, Inc. (In re CIS Corp.)*, 214 B.R. 108, 120 (Bankr. S.D.N.Y. 1997)). Though the subjective test compares the course of dealings of the parties, it essentially is a comparison of two sets of data over differing periods of time. It therefore seems reasonable to apply these same principles to an objective analysis by comparing the timing of purported preference payments with the timing of payments in the industry as a whole.

In the subjective analysis, courts do this by using the "average lateness" method, "which looks to the average time of payment after the issuance of the invoice during the historical and [P]reference [P]eriods. In deciding what payments are ordinary, a court reviews the range of payments centered around the average and also groups the payments in buckets by age." *Quebecor*, 491 B.R. at 388. By contrast, courts have criticized the "total range" method, which considers a transfer during the preference period to be ordinary if it is paid within the minimum

19

and maximum days in the range of all payments during the historical period. *See id.* at 387-88.

Total range analysis has been rejected because it "impermissibly expand[s] the ranges of

ordinary transactions . . . [and] captures outlying payments that skew the analysis of what is

ordinary." *See id.* (citing *In re M. Fabrikant & Sons, Inc.*, 2010 Bankr. LEXIS 3941, at *3 n.2

(Bankr. S.D.N.Y. 2010); *In re CIS Corp.*, 214 B.R. 108, 120 (Bankr. S.D.N.Y. 1997)).

When viewed in this light, Mr. Salutric's analysis is revealed as suspect. Simply put, his

range of permissible payments is too broad. As the Trustee points out, Mr. Salutric uses a range

of 14 to 70 days in 2008 and 16 to 72 days in 2009 that includes outliers that unreasonably

extended the range. More specifically, Mr. Salutric used the CRZM database to rank businesses

in the shipping industry according to average DSO per year for both 2008 and 2009. *See*

Defendants' Exhibit A. Mr. Salutric testified that he looked to the payment practices in 90% of

the industry, removing only the top and bottom five percent in his analysis as outliers.[12]

Defendants' Exhibit A; Trial Tr. 99:6-16. In determining that he should use the 90% figure as

his range, he relied only on his judgment, stating that the data points at the outer limits "would be

maybe atypical for the industry." (Trial Tr. 132:2-11, March 19, 2013).[13]

---

[12]    It is unclear whether these outliers had already been removed from the information that the Defendants provided to the Court. Defendant does not conclusively state this to be the case and, if so, Defendants have failed to inform the Court as to how many companies were excluded or provided the Court with any information regarding those companies. For purposes of the Court's analysis, however, the Court assumes that the data provided in Defendants' Exhibit A includes the full industry database, prior to the removal of any outliers. In fact, a review of Defendants' Exhibit A shows that only two companies out of a total of 40 from the CRZM data fall outside of Mr. Salutric's 16 to 72 date range. *See* Defendants' Exhibit A.

[13]    Mr. Salutric's conclusion is also undercut by a lack of support for his methodology. Mr. Salutric testified that in formulating this analysis, he did not consider any alternative methods for sorting the data. Trial Tr. at 132:12-16. Mr. Salutric was unaware of any case law that adopted his formulation. *Id.* at 132:20-22. He got no input from counsel in conducting his investigation and rendering his opinion, nor did he review any other expert testimony on the process of rendering his report with respect to ordinary business terms or consult any other professionals or peer review on how to go about doing so. *Id.* at 131:6-18; 133:9-19. Mr. Salutric consulted one article which he described as "high-level" and discussed what to expect when testifying as an expert witness. *Id.* at 131:20-132:1. But the article did not discuss the methodology to be used in determining the ordinary course of business. *Id.* at 131:20-25.

As an alternative, the Trustee believes that a more accurate depiction of the industry pay range is a single standard deviation from the mean.[14] Similar to the average lateness method, a standard deviation analysis serves to view the payments centered around the mean. In post-trial briefing, Trustee concluded that, on average, the industry collected on their invoices within 42 days with a standard deviation of 12 days.[15] As a result, the Trustee maintained that the proper industry pay range is 30 to 54 days. As support for its alternative single standard deviation analysis, the Trustee cites to an article discussing the methodology for an analysis of whether transfers are made in the ordinary course of business between the parties under Section 547(c)(2)(A) of the Bankruptcy Code. *See* George Abrams, Joseph Steinfeld Jr. and Joseph Hess, *Prosecuting Preference Actions Post-BAPCPA: Another View Toward a Reliable Statistical Model*, 25-10 ABIJ 54, December 2006-January 2007. The article explains that for purposes of calculating the difference between the baseline average of the historical period and the preference period, it is statistically sound to use a percentage that is at or close to the standard deviation percentage. *See id.* at 107-08. While the article does not touch on computation of an ordinary business terms analysis, the Court believes that the purpose of the two methods is similar enough that the Court can look to this methodology in analyzing the available data.

When compared to this methodology, the naked, unweighted averages used by Mr. Salutric can be seen as not appropriately representative. His mechanical exclusion of two companies from the list of forty does not appropriately account for outliers and skews the industry range too much by condoning all payment practices within 90% of the industry. By

---

[14] "A 'standard deviation' is a statistical measure of the amount by which a set of values differs from the arithmetical mean. In plain English, when the standard deviation number is applied to both sides of the mean, the numbers that fall within the resulting range will encompass 67.76 percent of all numbers used to arrive at the mean." George Abrams, Joseph Steinfeld Jr. and Joseph Hess, *Prosecuting Preference Actions Post-BAPCPA: Another View Toward a Reliable Statistical Model*, 25-10 ABIJ 54, December 2006-January 2007, at 108 n.5.

[15] The Court notes that the Plaintiff appears to concede what is taking place in the industry and does not challenge the information or credibility of the CRMZ database.

contrast, the Trustee notes that a single standard deviation encompasses approximately 68 percent of the data set.[16]  The Court therefore adopts the Trustee's use of one standard deviation from the mean.[17]  All transfers that fall within the range of 30 to 54 days should be considered as having been made within ordinary business terms.

Fourth and finally, the Trustee argues that the preference payments are not made pursuant to ordinary business terms because the Defendants were paid in full prior to the Debtors' bankruptcy.  It appears that the Defendants disagree and, in fact, the Trustee has failed to provide evidence that the Defendants have been paid in full.  The Trustee relies on the fact that no proof of claim was filed by the Defendants.  In and of itself, however, this is not enough.  The Trustee also states that Joint Exhibit A shows that all of the Defendants' invoices were paid by the end of the Preference Period.  But this exhibit does not establish that fact; the 77 page exhibit merely lists payments and invoices but does not provide a balance that nets out the two.  In any event, payment in full does not necessarily constitute treatment outside of ordinary business terms.  *See Tolona*, 3 F.3d at 1031 (ruling that the payments in question had followed ordinary business terms, despite noting that "the checks . . . cleared and as a result Tolona's debts to Rose were paid in full.")

In sum, the Court concludes that the Defendants are entitled to the benefit of the ordinary business terms defense, but not to the extent claimed.  The Court cannot determine the monetary scope of its ruling on the ordinary business terms defense, nor have the parties quantified the impact of the new value defense.  The Court requests that the parties quantify these matters and

---

[16]     Two standard deviations would account for approximately 95 percent of the data set, which would impermissibly expand the range.

[17]     In its reply brief, UPS states that the Trustee does not explain how the use of a single standard deviation is appropriate, given that the industry data does not reflect a "normal bell curve."  UPS, however, provides no analysis as to what the industry data shows with respect to a bell curve and offers no basis to understand such data other than their modified total range analysis based on 90% of the industry.

inform the Court whether it is necessary for the Court to decide whether any of these transfers are covered by the ordinary course of business defense under Section 547(c)(2)(A) of the Bankruptcy Code.  The parties should contact Chambers to set a status conference to discuss these remaining issues.

### C. <u>Prejudgment Interest</u>

Finally, the Court grants the Trustee's request for prejudgment interest for any preferences recoverable, which is a determination within a court's discretion for actions brought under Section 547 of the Bankruptcy Code.  *In re Pameco Corporation*, 356 B.R. 327, 342 (Bankr. S.D.N.Y. 2006); *In re Cyberrebate.com, Inc.*, 296 B.R. 639, 645 (Bankr. E.D.N.Y. 2003).  Pursuant to Section 550(a), a plaintiff can recover a preferential transfer or its value. 11 U.S.C. § 550(a).  The policy of Section 550 is to restore the estate the full value of the asset transferred to the preferred creditor, thereby compensating the estate for the loss of the time value of the asset.  *In re L&T Steel Fabricators, Inc.*, 102 B.R. 511, 521 (Bankr. N.D. La. 1989). Value includes pre-judgment interest from the date of the transfer.  *Id.*  The time value of money is an asset of the estate that should be recovered for the benefit of all creditors under the policy in the Bankruptcy Code, which favors equal treatment for all creditors of a bankruptcy estate.  By awarding pre-judgment interest from the date of a preferential transfer, both the estate and the transferee are restored to the economic position each were in prior to the preferential. Prejudgment interest is not a penalty, but rather is viewed as "delayed damages to be awarded as a component of compensation to the prevailing party."  *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 654 n.10 (1983); *see also West Virginia v. United States*, 479 U.S. 305, 310 n.2 (1987).

## <u>CONCLUSION</u>

For the reasons stated above and consistent with its Opinion, the Court determines that the Defendants prevail in part on their ordinary business terms defense under Section 547(c)(2)(B) of the Bankruptcy Code.  The Court reserves judgment on the ordinary course of business defense under Section 547(c)(2)(A) until it becomes clear that a decision is necessary on that issue.  Defendants' should settle an order on three days' notice.

Dated: New York, New York
      April 17, 2014


                                     *<u>/s/ Sean H. Lane</u>*
                                       UNITED STATES BANKRUPTCY JUDGE